**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KINGSTON HOSPITAL and**
**BENEDICTINE HOSPITAL,**

|                          |                    |
|--------------------------|--------------------|
|          **Plaintiffs,** | **1:09-cv-1303**   |
|                          | **(GLS/RFT)**      |
|          **v.**          |                    |

**KATHLEEN SEBELIUS, in her official**
**capacity as Secretary of Health and**
**Human Services and NATIONAL**
**GOVERNMENT SERVICES BLUE**
**CROSS/BLUE SHIELD ASSOCIATION,**

                    **Defendants.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|------------------|-----------------|
| **FOR THE PLAINTIFFS:** | |
| Garfunkel, Wild Law Firm | COURTNEY A. ROGERS, ESQ. |
| Great Neck Office | ROY W. BREITENBACH, ESQ. |
| 111 Great Neck Road | |
| Great Neck, NY 11021 | |
| | |
| **FOR THE DEFENDANTS:** | |
| U.S. Dept. of Health and Human Services | JONATHAN C. BRUMER, ESQ. |
| Office of the General Counsel - CMS Division, Room 5344 | |
| 330 Independence Avenue SW | |
| Washington, DC 20201 | |
| | |
| HON. RICHARD S. HARTUNIAN | DIANE CAGINO |
| Office of United States Attorney | WILLIAM F. LARKIN |
| 445 Broadway, 218 James T. Foley Courthouse | Assistant United States Attorneys |
| Albany, NY 12207-2924 | |

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiffs Kingston and Benedictine Hospitals commenced this action against defendants Kathleen Sebelius, in her official capacity as Secretary of Health and Human Services ("Secretary"), and National Government Services Blue Cross/Blue Shield Association ("NGS"), pursuant to 42 U.S.C. § 1395oo, seeking judicial review of the Secretary's denial of reimbursements for costs associated with offsite training of residents during fiscal years 2000 and 2001.[1]  (Compl., Dkt. No. 1; Compl., Dkt. No. 1, 1:10-cv-868.[2])  Pending are plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment.  (Dkt. Nos. 24, 27.)  For the reasons that follow, defendants' motion is granted in part and denied in part, and plaintiffs' motion is denied.

---

[1] Benedictine seeks review only of the Secretary's denial of reimbursement for fiscal year 2000.  (Compl., Dkt. No. 1, 1:10-cv-868.)

[2] Plaintiffs' separate appeals were consolidated into the present action on November 18, 2010.  (Dkt. No. 18.)

2

## II. **Background**[3]

### A.    **Regulatory Framework and Appeals Process**

The Department of Health and Human Services ("HHS") is charged with administering the Medicare program, which was established to provide health insurance to the aged and disabled.  (Dkt. No. 1, Attach. 1 at 4.) Under the Medicare program, private insurance companies known as fiscal intermediaries ("intermediaries") are contracted to perform payment and audit functions.  (*Id.*)

To receive reimbursement under Medicare, health service providers ("providers") must submit to their assigned intermediary a report at the close of each fiscal year detailing costs incurred and the portion of those costs to be allocated to Medicare.  (*Id.* citing 42 C.F.R. § 413.20.)  The intermediary determines the amount of Medicare reimbursement to which the provider is entitled, and issues a Notice of Program Reimbursement ("NPR").  (*Id.*)  Providers may appeal adverse NPR determinations to the Provider Reimbursement Review Board ("Review Board") within 180 days of the issuance of the NPR.  (*Id.*)  Absent further action by the Secretary within 60 days, the Review Board's decision is final.  42 C.F.R. §§

---

[3] The facts are undisputed unless otherwise noted.

405.1871(b), 405.1875(a).  A provider may obtain judicial review of a final decision by means of a civil action brought within 60 days of notification of such decision.  42 U.S.C. § 1395oo(f)(1).

**B.    Medicare Payment for Costs of Medical Education**

Medicare reimburses providers for the direct and indirect costs of graduate medical education.  (Dkt. No. 1, Attach. 1 at 4.)  The Medicare statute in place during the relevant period provided for reimbursement for time spent by residents in non-hospital settings where the resident was engaged in patient care activities and "the hospital incur[red] all, or substantially all, of the costs for the training program in that setting."  42 U.S.C. §§ 1395ww(d)(5)(B)(iv), (h)(4)(E) (2000).  In promulgating regulations to facilitate the implementation of this statute, the Secretary further required a written agreement between providers and non-hospital sites indicating that the provider bore responsibility for incurring the cost of residents' salaries and fringe benefits as well as compensation for supervisory teaching activities.  42 C.F.R. §§ 413.86(f)(4), 412.105(f) (2000 & 2001).

**C.    Factual History**

In 1983, plaintiffs Kingston and Benedictine—both hospitals in

4

Kingston, New York—jointly established the Mid-Hudson Family Health

Services Institute ("Institute").  (Dkt. No. 27, Attach. 4 ¶ 7.)  The Institute

operated a diagnostic and treatment center as well as an accredited

residency program.  (*Id.* ¶ 8.)  Between 1983 and 2001, Kingston and

Benedictine executed three agreements by which they agreed to, *inter alia*,

cover the Institute's deficits and provide the Institute with adequate cash

flow.  (Dkt. No. 1, Attach. 1 at 6.)  During 2000 and 2001, the residency

program was comprised of approximately 20 residents who divided their

time between Kingston, Benedictine and non-hospital locations.  (Dkt. No.

24, Attach. 2 at 7.)

On June 8, 2004 and July 8, 2005, NGS, Kingston's intermediary,[4]

issued its NPR for fiscal years 2000 and 2001, respectively.  (*Id.*)  In both

NPRs, NGS found that the time spent by Kingston residents in non-hospital

settings throughout 2000 and 2001 should not be counted for Medicare

reimbursement, resulting in a disallowance of over $1 million.  (*Id.* at 7-8.)

On June 18, 2004, NGS issued a substantially identical NPR in relation to

Benedictine's reimbursement for fiscal year 2000, resulting in a

_____

[4] At the time that it issued the NPRs in question, NGS operated under the name "Empire Medicare Services."  (Pls.' Statement of Material Facts ("SMF") ¶ 4, Dkt. No. 24, Attach. 4.)  To maintain consistency with the parties' submissions, the court refers to the intermediary as NGS.

disallowance of over $550,000.  (*Id.* at 8.)

**D.**    **Procedural History**

Kingston timely appealed both its 2000 and 2001 NPRs to the

Review Board.  (*Id.* at 9.)  In light of the similarities between the respective

appeals, the Review Board considered both NPRs in a consolidated

October 17, 2008 hearing.  (*Id.*)  In a September 23, 2009 decision, the

Review Board affirmed NGS' disallowance of reimbursement for time spent

by Kingston residents in non-hospital settings during fiscal years 2000 and

2001.  (Dkt. No. 1, Attach. 1 at 13.)  Specifically, the Review Board found

that: the written agreement requirement promulgated by the Secretary was

properly prescribed; plaintiffs did not qualify for relief under Section 713 of

the Medicare Prescription Drug, Improvement and Modernization Act of

2003, Pub.L. No. 108-173; and the covenants entered into by plaintiffs

between 1983 and 2001 failed to satisfy the written agreement requirement

of 42 C.F.R. § 413.86(f)(4). (Dkt. No. 1, Attach. 1 at 11-12.)  The Review

Board subsequently affirmed Benedictine's 2000 NPR as well.[5]  (*Id.*)

Kingston and Benedictine timely appealed the Review Board's decisions to

---

[5] Because of the extensive similarities with the previously-decided Kingston appeal, Benedictine and NGS waived their rights to a formal hearing and the Review Board considered the appeal on the record.  (*Id.*)

this court on November 11, 2009 and July 15, 2010, respectively.  (*Id.* at 9-10.)  These appeals were consolidated into the present action in an Order dated November 18, 2010.  (Dkt. No. 18.)

### III.  Standard of Review

The standard of review under Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*, No. 1:09-cv-652, 2011 WL 5599571, at *4 (N.D.N.Y. Nov. 17, 2011).

Under the Administrative Procedure Act, "a party seeking to upset agency action must demonstrate that the decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *St. Mary's Hosp. of Troy v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of Greater N.Y.*, 788 F.2d 888, 890 (2d Cir. 1986) (citing 5 U.S.C. § 706(2)(A)).  Under the "arbitrary and capricious" standard, agency action may be invalidated if it is not "rational and based on consideration of the relevant factors."  *F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 803 (1978) (internal citation and quotation omitted).  While review "is to be searching and careful, the court is not empowered to substitute its judgment for that of the agency."  *Id.* (internal citation and quotation

7

omitted).  Where an agency has taken adjudicative action, a reviewing

court "should accept the agency's factual findings if those findings are

supported by substantial evidence on the record as a whole." *Arkansas v.*

*Oklahoma*, 503 U.S. 91, 113 (1992).

"[T]he focal point for judicial review should be the administrative

record already in existence, not some new record made initially in the

reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  If the agency

has failed to consider all relevant factors, its action is unsupported by the

record, or the record is insufficient for the reviewing court to evaluate the

challenged action, "the proper course, except in rare circumstances, is to

remand to the agency for additional investigation or explanation." *Fla.*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## IV.  Discussion

## A.    Validity of Written Agreement Requirement

The first ground upon which Kingston and Benedictine seek to

invalidate the Secretary's denial of reimbursement is that the written

agreement requirement contained in 42 C.F.R. § 413.86(f)(4) (2000 &

2001)[6] is invalid as contrary to law.  (Dkt. No. 24, Attach. 2 at 12.)

Defendants contend that the Secretary has the authority to implement the

written agreement requirement and that the Review Board correctly found

the regulation to be properly prescribed.  (Dkt. No. 27, Attach. 1 at 12.)

The court agrees with defendants.

An agency's interpretation of a statute it is responsible for

administering is entitled to deference "so long as it is reasonable in light of

the two-step analysis set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def.*

*Council, Inc.*, 467 U.S. 837, 842-44 (1984)."  *Mei Fun Wong v. Holder*, 633

F.3d 64, 68 (2d Cir. 2011).  The first question under *Chevron* is "whether

Congress has directly spoken to the precise question at issue."  467 U.S. at

842.  Here, the precise question is "whether the Secretary may require a

written agreement before counting time spent by residents in non-hospital

---

[6] The regulation at issue specifically states that:

> The written agreement between the hospital and the nonhospital site must indicate that the hospital will incur the cost of the resident's salary and fringe benefits while the resident is training in the nonhospital site and the hospital is providing reasonable compensation to the nonhospital site for supervisory teaching activities.  The agreement must indicate the compensation the hospital is providing to the nonhospital site for supervisory teaching activities.

42 C.F.R. § 413.86(f)(4) (2000 & 2001).  The same requirements are also incorporated into 42 C.F.R. § 412.105(f), and the court's analysis of both regulations is identical.

settings." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 92 (D.D.C.

2009).  While 42 U.S.C. § 1395hh(a)(1) grants the Secretary broad

authority to "prescribe such regulations as may be necessary to carry out

the administration of" the Medicare program, and  42 U.S.C. §

1395ww(h)(4)(E) directs the Secretary to "establish rules consistent with

this paragraph," neither statutory provision speaks directly to the

permissibility of a written agreement requirement.  The Medicare statute is

therefore silent as to this query.

This silence leads the court to step two of the *Chevron* test, under

which an agency's statutory interpretation is only disturbed if it is "arbitrary

or capricious in substance, or manifestly contrary to the statute."  *Mayo*

*Found. for Med. Educ. & Research v. United States*, 131 S.Ct. 704, 711

(2011) (internal quotation and citation omitted).  The statutory provisions at

issue here both mandate that all time spent by residents in non-hospital

settings be counted toward a provider's reimbursement calculation if: (1)

the time is spent in patient care activities; and (2) the provider incurs all, or

substantially all, of the training costs in that setting.  42 U.S.C. §§

1395ww(d)(5)(B)(iv), (h)(4)(A), (E) (2000).  Kingston and Benedictine argue

that because the statutes impose only those two requirements, the

Secretary's promulgation of a written agreement requirement is inconsistent with congressional intent and contrary to law.  (Dkt. No. 24, Attach. 2 at 12-13.)

The Secretary's written agreement requirement, however, reflects a reasonable construction of the Medicare statute.  The purpose of the requirement is to, *inter alia*, "identify the costs of offsite training and to determine whether a hospital seeking Medicare reimbursement . . . paid all or substantially all [of those] costs."  Medicare Program: Payments to Hospitals for Graduate Medical Education Costs, 75 Fed. Reg. 71800, 72134 (Nov. 24, 2010) (to be codified at 42 C.F.R. pts. 410-13, 416, 419, 489).  With this goal in mind, the Secretary could "permissibly conclude that a written agreement is not a new substantive requirement but a procedural mechanism for satisfying the two statutory requirements."  *Covenant Med. Ctr., Inc. v. Sebelius*, 424 F. App'x 434, 438 (6th Cir. 2011).  Congress' endorsement of the Secretary's authority to require documentation prior to reimbursement is evident by its mandate that payment not be made unless the provider has "furnished such information as the Secretary may request in order to determine the amounts due such provider."  42 U.S.C. § 1395g(a); *see also Covenant,* 424 F. App'x at 438.  It is entirely reasonable

11

for the Secretary to determine that "the written agreement would improve administrability, and thereby avoid the wasteful litigation and continuing uncertainty that would inevitably accompany a purely case-by-case approach." *Id.* (internal quotation and citations omitted).

In light of the authority granted by Congress to the Secretary, and the deference owed the Secretary under *Chevron*,[7] the written agreement requirement is neither arbitrary, capricious nor contrary to law.  *See Covenant,* 424 F. App'x at 439; *Cottage Health,* 631 F. Supp. 2d at 91-93; *Chestnut Hill Hosp. v. Thompson*, No. 04-1228, 2006 WL 2380660, at *4 (D.D.C. Aug. 15, 2006).  The Review Board's determination that the regulation was properly prescribed is therefore affirmed.

## B.   Sufficiency of Written Agreements

Kingston and Benedictine argue next that even if the written agreement requirement is valid, it was satisfied by their 1983 and 2001

---

[7] Contrary to the contentions of Kingston and Benedictine, the Secretary's 2004 addition of an alternative means by which providers may establish compliance with the statutory cost requirement, *see* 42 C.F.R. § 413.78(e) (2011), does not alter the deference owed the Secretary in relation to the written agreement rule.  *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 981 (2005) (holding that "if the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (internal quotations and citation omitted)).  Here, the Secretary has not invalidated the written agreement requirement—it is still a permissible means of meeting the statutory cost requirement—but rather has simply offered providers alternative avenues of compliance.

undertakings.  (Dkt. No. 24, Attach. 2 at 17-21.)  Defendants aver that the

Review Board's findings to the contrary are supported by the substantial

evidence of the record.  (Dkt. No. 27, Attach. 1 at 29.)  The court finds merit

in both arguments.

In a 1983 undertaking establishing the Institute, Kingston and

Benedictine agreed to "jointly and severally guarantee and agree to

contribute to the Institute, on at least an annual basis, sufficient funds to

meet any annual deficits incurred by the Institute, and to provide an

adequate cash flow to the Institute in order to assure the Institute's financial

viability."  (Dkt. No. 27, Attach. 4 ¶¶ 10-11.)  The Review Board found that

this undertaking failed to satisfy the written agreement requirement

because it: (1) was between hospitals, not the hospitals and non-hospital

sites; (2) made "no provision for the costs of the residents' salaries and

fringe benefits"; and (3) was "silent relative to the compensation the

hospital [was] providing to the nonhospital site for supervisory teaching

activities."  (Dkt. No. 1, Attach. 1 at 12.)  While Kingston and Benedictine

argue that the 1983 undertaking rendered them "effectively responsible for

paying" for the residency program (*see* Dkt. No. 24, Attach. 2 at 19), the

Review Board's determination that the writing fell short of the specific

13

requirements of the regulation is clearly supported by substantial evidence.

On April 26, 2001, Kingston and the Institute entered into an "Affiliation Agreement" with an effective date of July 1, 2001, and Benedictine left the residency program.  (Dkt. No. 27, Attach. 1 at 34.) Because the effective date of the agreement was found to be "six months after the beginning of FY 2001 and after residents were placed into nonhospital settings," the Review Board did not address the writing on the merits.[8]  Relying on its previous decision in *Hallmark Health Sys.,* PRRB Dec. No. 2008-D4 (Oct. 16, 2007), the Review Board stated that an agreement "which post dates the placement of residents in the nonhospital setting cannot be applied retroactively to establish compliance with the regulation."  (Dkt. No. 1, Attach. 1 at 12.)  In *Hallmark*, the Board read 42 C.F.R. § 413.86(f)(4)(ii) to require that the written agreement be in place "within the relevant fiscal year or before the time that the . . . residents begin their 'rotations.'"  (Dkt. No. 24, Attach. 3 at 7.)

While the court does not question the Secretary's interpretation of its own regulation as requiring a contemporaneous written agreement, the

---

[8] In a Concurring Opinion, Review Board member Yvette C. Hayes analyzed the 2001 Affiliation Agreement on the merits and determined that it did not satisfy the written agreement requirement.  (Dkt. No. 1, Attach. 1 at 14.)

14

facts in the record do not support the conclusion that the 2001 Affiliation Agreement became effective after residents were placed into non-hospital settings.[9]  Kingston's residency program operates on an academic calendar year beginning July 1 and ending June 30.  (Dkt. No. 30 at 11.)  Because the Affiliation Agreement's effective date was July 1, 2001, it was in place when Kingston residents began their rotations on that same date.[10]  (*Id.*)  Accordingly, the issue is remanded to the Secretary to determine whether the Affiliation Agreement satisfied the written agreement requirement of 42 C.F.R. §§ 413.86(f)(4) for the period July 1, 2001 to December 31, 2001.[11]

## C.   Section 713 Exemption

Finally, Kingston and Benedictine argue that they are exempted from

_____

[9] Yvette C. Hayes reached the same conclusion in her Concurring Opinion.  (Dkt. No. 1, Attach. 1 at 14.)

[10] Defendants argue that the Affiliation Agreement was not effective as of July 1, 2001 because of technical deficiencies that made the contract aspirational.  (Dkt. No. 27, Attach. 1 at 34-37.)  Because the Review Board did not address the merits of the Affiliation Agreement, however, it is not the court's place to entertain a contract law argument between the parties.  The plain language of the agreement states that the effective date was July 1, 2001.  (Dkt. No. 27, Attach. 1 at 34.)  Accordingly, a written agreement was in place between Kingston and the Institute as of July 1, 2001, when the residents began their rotation, and the sufficiency of that agreement should be determined by the Secretary.

[11] Despite defendants' contentions, the Review Board did not reach a decision as to whether Kingston "incur[red] all or substantially all of the costs for the training program in the nonhospital setting."  (Dkt. No. 1, Attach. 1 at 13.)  The Secretary need only reach this issue if it finds that the written agreement rule was satisfied by the Affiliation Agreement during the specified period.

the written agreement requirement by Section 713 of the Medicare

Prescription Drug, Improvement and Modernization Act of 2003, Pub.L. No.

108-173.  Defendants contend successfully that the Secretary reasonably

construed Section 713, and that Kingston and Benedictine are not entitled

to an exemption.

> Section 713 provides:
>
> During the one year period beginning on January 1, 2004, for purposes of [calculating the reimbursement owed hospitals for medical residents training in non-hospital settings], the Secretary shall allow all hospitals to count residents . . . without regard to the financial arrangement between the hospital and the teaching physician practicing in the non-hospital site to which the resident has been assigned.

*Chestnut Hill,* 2006 WL 2380660 at *3.  The Secretary interpreted Section

713's moratorium to apply to: "(1) all training that occurred in calendar year

2004"; and "(2) all training that occurred before 2004," if the intermediary

determined reimbursability during 2004.  *Chestnut Hill,* 2006 WL 2380660,

at *3.  Furthermore, the Secretary interpreted Section 713 to require

compliance with all aspects of the written agreement requirement other

than the financial arrangement between the hospital and the teaching

physician at the non-hospital site.  Medicare Program; Changes to the

Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005

16

Rates, 69 Fed. Reg. 48916, 49178 (Aug 11. 2004)  (to be codified at 42

C.F.R. pts. 403, 412, 413, 418, 460, 480, 482, 483, 485, 489); (Dkt. No. 27,

Attach 1 at 23-24.)  Based upon these interpretations, the Review Board

found that Kingston and Benedictine's lack of a written agreement

foreclosed application of the Section 713 exemption.  (Dkt. No. 1, Attach. 1

at 11.)  Plaintiffs dispute the Secretary's statutory interpretations.  (Dkt. No.

24, Attach. 2 at 14-16.)

As discussed above, agency interpretation of a statute is analyzed

under the two part *Chevron* test.  *Mei Fun Wong,* 633 F.3d at 68.  Section

713 is ambiguous as to the extent of activity which falls under the "one year

period beginning on January 1, 2004."  The question therefore becomes

whether the Secretary's construction of this language was reasonable.

*Mayo Found.,* 131 S.Ct. at 711 (internal citation omitted).  In light of the

statutory language, reading Section 713 to apply to training that occurred

during calendar year 2004 is indisputably reasonable.

Kingston and Benedictine argue instead that the Secretary's inclusion

of pre-2004 training for which an intermediary determines reimbursability in

2004 should be expanded to include all pre-2004 training that is before an

intermediary during that year.  (Dkt. No. 24, Attach. 2 at 15.)  While the

17

Secretary's construction may in some instances place more reliance than is ideal on the timing of intermediary decision-making,[12] its interpretation of Section 713 is neither arbitrary, capricious nor contrary to law. *Mayo Found.,* 131 S.Ct. at 711 (internal citation omitted).

Lastly, Kingston and Benedictine aver that the Secretary's reading of Section 713 to require compliance with all aspects of the written agreement requirement except that relating to the financial arrangement between the hospital and the teaching physician at the non-hospital site is too narrow. (Dkt. No. 24, Attach. 2 at 15-16.)  The plain language of Section 713, however, makes clear that the Secretary's interpretation is entirely in line with the statute.  To the limited extent that the statute may be construed as arbitrary, the Secretary's reading of it is eminently reasonable.

Having determined that the Secretary's construction of Section 713 is reasonable, it is apparent that the Review Board properly determined that neither Kingston nor Benedictine qualified for an exemption.  The 2000 Cost Reports for both hospitals were settled by NGS in 2004, thereby

---

[12] In fact, if the Secretary's interpretation is flawed at all, it is likely for being too broad, not too narrow. *See Chestnut Hill,* 2006 WL 2380660, at *5 (finding that Section 713 is "most naturally read to apply only to rotations that occurred in 2004." (internal citation omitted)).  The court's analysis, however, ends at its determination that the Secretary's construction is reasonable under *Chevron*.

meeting Section 713's temporal requirement.  (Dkt. No. 24, Attach. 2 at 15.)  As determined above, however, neither hospital had a valid agreement in place during fiscal year 2000.  Kingston's 2001 Cost Report was settled by NGS in 2005, rendering the Secretary's analysis on remand of the written agreement in place between July 1, 2001 and December 31, 2001 irrelevant to the Section 713 analysis.  (*Id.*)  Accordingly, the Secretary's finding that neither Kingston nor Benedictine qualified for relief under Section 713 is affirmed.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. No. 24) is **DENIED**; and it is further

**ORDERED** that the defendants' cross motion for summary judgment (Dkt. No. 27) is **GRANTED** in part and the Secretary's findings are **AFFIRMED** as to:

1. The validity of the Secretary's written agreement requirement in 42 C.F.R. § 413.86(f)(4); and

2. The lack of relief available to plaintiffs under Section 713 of the Medicare Prescription Drug, Improvement and

19

Modernization Act of 2003, Pub.L. No. 108-173; and it is further

**ORDERED** that the defendants' cross motion for summary judgment

(Dkt. No. 27) is **DENIED** in part as to the sufficiency of the April 26, 2001

agreement between Kingston and the Institute; and it is further

**ORDERED** that the action is remanded to the Secretary to answer

the following questions:

> 1. Whether the April 26, 2001 agreement between Kingston and
>
> the Institute satisfied the written agreement requirement in 42
>
> C.F.R. § 413.86(f)(4); and, if so:
>
> 2. Whether Kingston "incur[red] all or substantially all of the
>
> costs for the training program in the nonhospital setting in
>
> accordance with the definition of paragraph (b) of this section"
>
> as required to satisfy 42 C.F.R. § 413.86(f)(4)(iii) for the period
>
> July 1, 2001 to December 31, 2001; and it is further

**ORDERED** that upon a final determination by the Secretary on the

question(s) presented on remand, Kingston Hospital may appeal the

Secretary's decision, if it so chooses, in accordance with 42 U.S.C. §

1395oo(f)(1); and it is further

**ORDERED** that the parties notify the court upon the Secretary's final

20

determination on the question(s) presented on remand; and it is further

     **ORDERED** that the Clerk terminate Benedictine Hospital as a party

to this case; and it is further

     **ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

December 8, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge

21